UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BERKSHIRE SETTLEMENTS, INC.,
A Georgia Corporation,
CHURCH STREET NOMINEES LTD.
A Cayman Islands Corporation, and
ASSURED FUND,
A Cayman Islands Corporation,
    Plaintiffs
v.

ALEXANDER ASHKENAZI,
An Individual and as Trustee for
HALPERT ALEXANDER TRUST,
A New York Trust,
MALI HALPERT, an Individual,
JOHN HANCOCK LIFE INSURANCE COMPANY
A Foreign Corporation,
CAMBRIDGE LIFE SETTLEMENTS LLC,
A New York Corporation,
GLOBAL LIFE SETTLEMENTS, INC.
A New York Corporation, and
JOEL ECKSTEIN,
An Individual,
    Defendants.

CASE NO.: 09-CV-0006 (FB) (JO)

*(Oral Argument Requested)*

## PLAINTIFFS' REPLY TO HANCOCK'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF LAW IN SUPPORT

Pursuant to Rule 56, Fed.R.Civ.P., and Local Rule 56.1, Plaintiffs BERKSHIRE SETTLEMENTS, INC., CHURCH STREET NOMINEES LTD. and ASSURED FUND, file their REPLY TO DEFENDANT JOHN HANCOCK LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. ii

I. PRELIMINARY STATEMENT ................................................. 1

    1. Contesting the Trust is just another way to contest the Policy. ................................................................ 2

    2. Mali Halpert intended to become insured. ...................... 2

    3. Forfeiture is where the beef is. ...................................... 3

        a. Hancock admits that it failed to provide the Trust with the statutory notice. ................... 3

        b. Hancock received actual notice of the Trustee's "fraud" but did nothing. ........................................ 5

        c. By holding on to the Plaintiffs' $275,000 premium payment for 100 days after it learned of the Trustee's last set of bad checks, Hancock waived any right to treat the policy as lapsed. (Reply to Point IV) ............ 6

        d. Hancock's other *Red Herrings*. ........................................ 8

            1. Plaintiffs never told Hancock that it was going to transfer $900,000 to Ashkenazi. ............ 8

            2. Plaintiffs transacted with the Trustee on the basis of a mere phone call. .................................... 8

            3. Plaintiffs Decline Reinstatement. ........................ 8, 9

            4. Hancock is the victim. ........................................ 9

            5. Plaintiffs have alleged that Hancock routinely accepts checks after a Policy has lapsed. ............ 9

            6. Halpert's testimony alerted Hancock that a "sham" was underfoot. ........................................ 9

# TABLE OF AUTHORITIES

**Cases**

*Cronk v. Metropolitan Life Ins. Co.*,
69 A.D.2d 977, 416 N.Y.S.2d 104 (4th Dept., 1979) .......................... 6, 7

*Johnson v. Metropolitan Life Ins. Co.*,
2010 WL 4941507 (N.Y.A.D. 1 Dept.) .............................................. 2

*Kramer v. Phoenix Life Ins. Co.*,
2010 NY Slip Op 8376 (N.Y., 2010) ................................................ 1

*Lincoln Life & Annuity Co. of NY v. Bernstein*,
2009 NY Slip Op 51421 (U) (N.Y. Sup. Ct. 6/29/2009),
2009 NY Slip Op 51421 (N.Y. Sup. Ct., 2009) .................................. 1

*Marinello v. Dryden Mut. Ins. Co.*,
237 A.D.2d 795, 655 N.Y.S.2d 156 (3rd Dept., 1997) ........................ 8

*New England Mut. Life Ins. Co. v. Caruso*,
73 N.Y.2d 74, 538 N.Y.S.2d 217 (N.Y., 1989) .................................. 1

*Speziale v. National Life Ins. Co.*,
328 F.Supp.2d 295 (N.D.N.Y., 2004) .............................................. 1

**Statutes**

NY Ins. §3211 (a) (2) ................................................................... 4

I. **PRELIMINARY STATEMENT**

This case boils down to the proper application of three bedrock insurance principles: (1) incontestability; (2) insurable interest; and (3) forfeiture. A new reality was ushered in by the New York Court of Appeals decision in *Kramer v. Phoenix Life Ins. Co.*, 2010 NY Slip Op 8376 (N.Y.A.D. 1 Dept.), which acknowledged for the first time the legitimacy of Stranger Originated Life Insurance ("STOLI") policies in a legal, enforceable and regulated marketplace. Some of the thresholds and parameters of this marketplace are now being tested by Hancock in this case. For those reasons explained below, a finding for Hancock on any of the issues it propounds is both inequitable and will erode the foundation of these bedrock principles.

As to the first principle, New York's position on incontestability is without rival in any other jurisdiction: "after a specified period of time the insurer's conditional promise to pay benefits shall become absolute." *New England Mut. Life Ins. Co. v. Caruso*, 73 N.Y.2d 74, 538 N.Y.S.2d 217 (N.Y., 1989).

As to the second principle, New York's position is again without rival: "an insurance company cannot rescind for lack of insurable interest after the contestability period ends, regardless of the merits of their allegations." *Lincoln Life & Annuity Co. of NY v. Bernstein*, 2009 NY Slip Op 51421 (U) (N.Y. Sup. Ct., 2009).

As to the last principle, New York's position is consistent with that of its sister states: "statutes requiring notice before forfeiture of a life insurance policy for nonpayment of the premiums are to be construed strictly in favor of the insured. [T]his is because the law does not favor forfeiture for nonpayment of premiums." *Speziale v. National Life Ins. Co.*, 328 F.Supp.2d 295 (N.D.N.Y., 2004).

1. <u>Contesting the Trust is just another way to contest the Policy.</u>

Hancock engages in an exercise of pretzel logic that employs the reference to provisions in an unauthenticated document, which document itself has most likely been tampered with, in order to establish its purported proposition that the Trust, the Policy and the Agreement to sell the Policy to the Plaintiffs are all void *ab initio*. In this manner, Hancock asserts that the Plaintiffs' failure to establish the exact terms of the Trust establish the negative: that the Trust didn't exist and was a "sham." Plaintiffs have filed a <u>Motion In Limine</u> that is found in PLAINTIFFS' 56.1 STATEMENT OF ADDITIONAL AND CONTROVERTING MATERIAL FACTS ("SOF-OPP") which is incorporated herein. But the point addressed here asks the question: "What would happen if the Court found for Hancock on this point?" The undeniable conclusion would be that the "absolute" incontestability standard that New York holds its insurers to would be completely undermined by an insurer who would be able, after the contestability period had run, to challenge the integrity of a policy by challenging the vessel that owned it. The stated public policy surrounding incontestability is simply that "New York's approach represents a policy choice to place the onus on the insurance company to investigate, within the two-year period, the veracity of the claims that a potential insured might make in an application for life insurance." *Johnson v. Metropolitan Life Ins. Co.*, 2010 WL 4941507 (N.Y.A.D. 1 Dept.). This stated public policy requires the finding for the Plaintiffs on this point.

2. <u>Mali Halpert intended to become insured.</u>

Hancock takes selected testimony by Mrs. Halpert, presents it to this Court out of context then makes the sweeping conclusion that Halpert has never heard of insurance.

The points relative to her intent to become insured (and thus engage in a series of STOLI transactions) are contained in III. <u>Motion To Take Judicial Notice of Additional Facts</u>, also contained in SOF-OPP. See also Randall Dec. Ex. 4. There is no question that Halpert intended to become insured by the Policy, and the six (6) other known multi-million dollar life insurance policies referenced in the Motion, and this fact is the ultimate consideration under the *Kramer* rationale. Hancock had two years to discover what it now contends it "uncovered" during discovery (a claim that stretches one's credulity) but is likewise now barred from using it by the incontestable clause.

    3.    <u>Forfeiture is where the beef is</u>.

In its simplest form, Hancock's argument is that the Trustee cheated it out of the $98,286.12 and that this act of fraud becomes the Plaintiffs' act of fraud by virtue of their assignment of the Policy. Hancock ignores the numerous inconvenient truths: (1) Hancock failed to comply with the statutory notice requirements; (2) Hancock ignored its actual knowledge that the Trustee was committing fraud; and (3) after advising its upper management that it had a problem with the Policy, Hancock compounded the problem by holding the Plaintiffs in limbo for 100 days, an unconscionable length of time.

    a.    <u>Hancock admits that it failed to provide the Trust with the statutory notice</u>. (Reply to Point V B).

Hancock admits that, other than the UL PREMIUM NOTICE (a notice that some unidentified vendor allegedly sent at some unknown date but that no one can know for sure because copies of it do not exist), no other premium notice was provided the Trust. Assuming for the moment that Hancock's assertion that *"[T]he 'BILLDATE' is an internally generated date shown on the computer system copy of the notice"* (JH MOL

3

OPP pg 25) is actually true and that the date has no apparent significance,[1] the fact remains that, even under its own explanation, Hancock violated N.Y. Ins. Law §3211 (a)(2) that requires the notice to be provided more than fifteen days <u>and not more than forty-five days</u> prior to the day when such payment becomes due. While stating that the Plaintiffs *"ignore the full text of the notice, which while it requested immediate payment, unambiguously advised the Trust that its last day to pay to avoid a lapse was May 12, 2008,"* Hancock ignores the full text of the statute that mandates that the notice be given not more than forth-five days <u>before</u> the lapse date. One does not need to consult a calendar to know that the UL PREMIUM NOTICE for the Policy, which contains a 61 day grace period, that was given *"more than the fifteen days notice they claim they did not get;* [but that was given in such time that] *it is the full grace period agreed to in the Policy,"* is a notice that was given <u>more</u> than forty-five days before the premium was due.

Apparently Hancock *attempts* to comply with the statute by again relying upon its computer system that *"is programmed to generate a 'Reminder Notice' if a payment has not been received within 30 days after it sends the Lapse Pending Notice. ... [T]he system is programmed that way so that the Reminder Notice is sent 'at least fifteen and not more than forty-five days prior to the day when such payment becomes due' in accordance with Section 3211."* (JH MOL OPP pg 27). But then admits that *"the system did not detect any outstanding amounts due and it therefore did not generate the Reminder Notice."* (JH MOL OPP pg 27). Incredibly, in describing this situation, Hancock quotes the undersigned by stating that it was *"fooled by the Trustee's repetitive issuance of NSF*

---

[1] Apparently the reference in the Notice to February 14, 2008 is merely some random date generated by the computer system for no apparent reason.

4

*Checks; a 'corrupt individual' who perpetrated 'check writing fraud' and was 'gaming Hancock's system.' ... [I]n short, Plaintiffs argue that they should be permitted to take advantage of alleged technical defects caused by their assignor's fraud."* What Hancock doesn't do is to accept responsibility for the defective system it created, or the fraud perpetrated upon it by the individual it sold the Policy to who was able to grasp the system's shortcomings as a consequence of his success in kiting checks to the system, or the incompetence of its personnel, or the fact that Plaintiffs are not seeking to take "advantage" of anything other than receiving and holding Hancock to the benefit of the bargain (i.e. to stand behind the Policy it issued), or the fact that Hancock's "alleged technical defects" in the system is neither technical nor an excuse for failing to comply with the statute.

In any event, Hancock was able to and should have generated the Reminder Notice upon receipt of Ashkenazi's 1st NSF Check, on April 23rd 2008, which would have provided the mandated statutory notice within 15 and not more than 45 days prior to the alleged lapse date of May 12, 2008, had Hancock programmed its system to make statutory compliance a priority. Had such an event occurred, the Plaintiffs would never have completed this transaction. See D.Dallas Dec. ¶13; S.Loy Dec. ¶9. The law does not favor forfeiture of life insurance policies for non-payment of premiums and this is strictly construed in favor of the Plaintiffs. *Speziale, Ibid.*

      b.    <u>Hancock received actual notice of the Trustee's "fraud" but did nothing</u>.

Not only did Hancock fail to give the statutory notice upon actual receipt of the Trustee's 1st NSF Check, but it overtly and intentionally deceived David Dallas who questioned the so called "Phony March 27 VOC," but who received Hancock's assurance

that it wanted to see the Phony VOC by fax just "to make sure that we get the proper name of the ownership on there." By failing to tell David Dallas, in the May 19th 2008 Verbal VOC, that the 1st and 2nd NSF Checks had been returned, by telling him that the Trustee had paid the premium, and by failing to follow up the faxed "Phony VOC" with a call back to him stating that the document was a forgery, David Dallas was deceived. See D.Dallas Dec. ¶¶4, 5, 6, 7, 8, 11, 12 and 13. Compounding this omission is the fact that Hancock knew, because David Dallas told its personnel on numerous occasions, that Berkshire was making these inquiries because it was in the process of buying the Policy. See D.Dallas Dec. ¶14, Ex. K.

    c.    <u>By holding on to the Plaintiffs' $275,000 premium payment for 100 days after it learned of the Trustee's last set of bad checks, Hancock waived any right to treat the policy as lapsed</u>. (Reply to Point IV).

There is no question but that Hancock held on to the $275,000 which Plaintiffs paid on May 27, 2008 for 100 days after it learned that the second set of bad checks, given by Ashkenazi in response to the 1st and 2nd NSF Checks, had also bounced. In answer to Plaintiffs' argument that this delay waived (or estopped Hancock from relying on) the alleged lapse of the Policy, (JH MOL OPP, pg 22-23), Hancock then misstates both the general rule stated in, and the holding of, *Cronk v. Metropolitan Life Ins. Co.*, 69 A.D.2d 977, 416 N.Y.S.2d 104 (4th Dept. 1979).

Hancock's misstatement of the general rule - - an insurer has three options in dealing with a premium received after a policy has lapsed, including the option of holding on to the money while it decides whether to reinstate the policy - - omits a critical part of this option. Correctly stated, that option "permits an insurer to retain such premium payments *for a reasonable length of time* ..." until it decides whether to

6

reinstate the policy. As the *Cronk* court went on to explain, "where an insurer receives payment of overdue premiums on a lapsed policy, it has a duty to decide promptly and act quickly on the matter of reinstatement. ... [A]n insurer is charged with a responsibility for efficient action far greater than is required of the corner grocer." *Cronk*, 416 N.Y.S.2d at 106 (internal quotation marks omitted).

Hancock's misstatement of *Cronk's* holding, *"that there was no waiver where the insurer held a post-grace period payment for over three months because it was being held pending a determination as to whether the policy would be reinstated,"* (JH MOL OPP pg 22), was not the operative set of facts that the *Cronk* court relied upon for its holding. What Hancock fails to advise is that in *Cronk* the late premium was paid by the insured's wife <u>after</u> he sustained injuries from which he died a few days later. The court rejected the argument that the three month delay in returning the money waived the lapse, <u>not</u> because it found three months to be a <u>reasonable time</u>, but because "the triggering date [for measuring the end of the delay period] was the death of the insured ..." The *Cronk* court explained its rationale by stating "[A]lthough the record does not reflect the actual date of receipt by the home office of agent Secretti's letter of September 29, 1971, the conclusion is inescapable that <u>at most there passed but a few days</u> between its receipt and the insured's death. [I]n such circumstances, it may not be said that the defendant either waived its rights under the policy or effected its reinstatement." (Emphasis added). *Cronk*, 416 N.Y.S.2d at 106. Indeed, if that court regarded three months as a reasonable period of time, it could have avoided the explanation and simply stated that proposition.

This leaves the question of whether Hancock's 100 Day Delay was reasonable. It is telling that Hancock does not argue that such a delay was reasonable, it simply ignores

7

*Cronk's* clear requirement of reasonable promptness to avoid waiver. Hancock cannot bring itself to actually state in its MOL that holding on to this money for 100 days was reasonable; it simply says that it *"returned the entire amount to Plaintiffs in September."* Although the reasonableness of a delay is generally a jury question, *Marinello v. Dryden Mut. Ins. Co.*, 237 A.D.2d 795, 655 N.Y.S.2d 156 (3rd Dept., 1997), Plaintiffs submit that for Hancock to hold on to the Plaintiffs' money, and to keep the Plaintiffs in limbo as to their rights against the Trustee, for 100 days is so plainly unreasonable as to warrant summary judgment in their favor; it cannot be viewed as so plainly reasonable as to permit summary judgment for Hancock on this issue.

  d.  Hancock's other <u>Red Herrings</u>.

    1.  <u>Plaintiffs never told Hancock that it was going to transfer $900,000 to Ashkenazi</u>.

Although Hancock was not informed as to the particulars of the Policy's purchase, it was advised, and did understand, that the Plaintiffs would be taking an assignment of the Policy. (D.Dallas Dec. ¶¶13, 14, Ex. K). What makes this particular assertion a Red Herring is the implication that Hancock would have stated something different to David Dallas had it known all of the details of the transaction.

    2.  <u>Plaintiffs transacted with the Trustee on the basis of a mere phone call</u>.

One has only to review the Declaration of Sarah Loy and the related exhibits to understand that the Plaintiffs did not transact for the Policy by a mere telephone call to Hancock. What makes this particular assertion a Red Herring is that the Plaintiffs' only real failure was believing what Hancock told them.

    3.  <u>Plaintiffs Decline Reinstatement</u>.

8

Hancock seems to place reliance upon the fact that the Plaintiffs did not file with it a reinstatement form that would have initiated another contestability period as well as further medical underwriting of Mali Halpert. What makes this assertion a Red Hearing is that Hancock fails to state what effect it would have afforded to the request (other than perhaps later asserting that the Plaintiffs elected a remedy) or how this request would have altered its "sham" theories to assert that the Trust, the Policy and the assignment were all void *ab initio*. Instead of continuing to trust that Hancock would do the right thing, an act that initially resulted in the 100 Day Delay, Plaintiffs have brought this action against it exposing its negligence.

4. <u>Hancock is the victim</u>.

What makes this assertion a Red Herring is that Hancock seeks to keep the money.

5. <u>Plaintiffs have alleged that Hancock routinely accepts checks after a Policy has lapsed</u>.

The undersigned has alleged in the moving and defending papers that Hancock routinely accepted NSF Checks to replace NSF Checks. What makes this assertion a Red Herring is that Hancock has expanded this rather simple truism into the false assertion that *"[P]laintiffs' arguments that the default should be excused because John Hancock had a 'uniform practice' of accepting checks after expiration of the Policy's grace period are wrong, not supported by any evidence, and legally meritless."* (JH MOL OPP pg 5).

6. <u>Halpert's testimony alerted Hancock that a "sham" was underfoot</u>.

Hancock implies that it was first alerted about the various "shams" as a result of the elderly Mali Halpert's testimony. What makes this a Red Herring is Hancock's selective and out of context use of Mrs. Halpert's statements as well as the fact that it

9

knowingly issued $10,000,000 of life insurance on the lives of Mr. & Mrs. Halpert who were at the time in their mid-eighty's and, not only did not have any prior need of life insurance in anything close to this amount, but who collectively represented that their entire estate was valued at $18,000,000.

II.  **REQUESTED RELIEF**.

The Plaintiffs respectfully request the following:

1. A declaration that the Policy did not lapse on or about June 3, 2008, or May 19, 2008 or at any other time prior to the Plaintiffs' purchase;

2. That John Hancock incurs the loss of the Trustee's failure to pay the premium due of $98,286.12;

3. That the Plaintiffs be provided with a detailed statement of the accrued premiums due on the Policy since their purchase of it and be provided a reasonable period of time to pay this amount;

4. The John Hancock's requested declaration that the Policy, the Trust and related transaction be declared void *ab initio* be itself denied;

5. That this Court reserve for further determination the Plaintiffs' claims to attorney's fees and costs of the litigation;

6. That this Court set this matter down for oral argument; and

7. For such other relief as is just and proper.

Respectfully submitted this March 25, 2011.

By: _____
    Charles P. Randall

10

Certificate of Service

I hereby certify that on March 25, 2011, the foregoing document was sent to be delivered by overnight courier to: Neil Merkle, Eric Post, KELLEY DRYE & WARREN LLP, 101 Park Avenue, New York, NY 10178; Brian J. Green, EDWARDS ANGELL PALMER & DODGE LLP, 750 Lexington Avenue, New York, NY 10022; Michael Paneth, TREFF & LOWY PLLC, 342 Bedford Avenue, Brooklyn, NY 11211.

/s/ Charles P. Randall
Charles P. Randall
Lead Counsel for Plaintiff
1200 N. Federal Hwy., #209
Boca Raton, Fl. 33432
TEL:  (561) 750-5050
FAX:  (561) 750-7272