UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
BERKSHIRE SETTLEMENTS, INC., a Georgia
Corporation, and CHURCH STREET NOMINEES
LTD., an Isle of Man Corporation, and ASSURED
FUND, a Cayman Islands Corporation,

                Plaintiffs,

   -against-

ALEXANDER ASHKENAZI, an Individual and
as Trustee for HALPERT ALEXANDER TRUST,
a New York Trust, MALI HALPERT, and
Individual, JOHN HANCOCK LIFE
INSURANCE COMPANY, a Massachusetts
Corporation, CAMBRIDGE LIFE
SETTLEMENTS, LLC, a New York Corporation,
GLOBAL LIFE SETTLEMENTS, INC., a New
York Corporation, and JOEL ECKSTEIN, an
Individual,

                Defendants.
-----------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 09-CV-0006 (FB) (JO)

*Appearances*:
*For the Plaintiffs*:
CHARLES P. RANDALL, ESQ.
1200 North Federal Highway, #209
Boca Raton, Florida 33432

*For Defendant John Hancock Life Insurance Company*:
NEIL MERKL, ESQ.
ERIC B. POST, ESQ.
Kelley, Drye & Warren, LLP
101 Park Avenue
New York, NY 101781

**BLOCK, Senior District Judge:**

      Church Street Nominees Ltd. ("Church Street") is the nominal owner of a $5,000,000 life insurance policy issued by John Hancock Life Insurance Company ("John Hancock") on the life of Mali Halpert ("Halpert"). It seeks a declaratory judgment that the policy remains in force and did

not lapse due to nonpayment of premiums by the prior owner, the Halpert Alexander Trust ("the Trust").[1]  Jurisdiction is premised on diversity and all agree that New York law governs.

Plaintiffs and John Hancock both move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the following reasons, Plaintiffs' motion is granted and John Hancock's is denied.

I

**A.  The Trust and the Policy**

The policy at issue has its beginnings in the creation of the Trust.  In a declaration of trust dated April 1, 2005, Halpert ostensibly granted to Ashkenazi, as trustee, "all of [her] rights, title and interest on and to the life insurance policy or policies listed in Schedule A annexed hereto."  Merkl Decl., Ex. 14, at 1.[2]  Upon Halpert's death, the corpus of the trust was to be distributed to "Malka Schwartz daughter of Mali Halpert." *Id.* at 3.  At her deposition, Halpert denied having ever seen the declaration of trust and was "nearly sure"—though "not quite"—that the "Mali Halpert" signature appearing on the declaration was not hers.  Halpert Dep. at 29, 38.  She does not have a daughter and has "no idea" who Ashkenazi and Malka Schwartz are.  *Id.* at 19, 25.

---

[1]Joining Church Street as plaintiffs are the Assured Fund ("the Fund"), the beneficial owner of the policy, and Berkshire Settlements, Inc. ("Berkshire"), which negotiated the policy purchase.  Although Berkshire has not identified what interest it has in the rights and obligations of a policy it does not own, its presence in the litigation is immaterial inasmuch as it seeks the same declaratory relief as the policy owners.  The Court refers to these three parties collectively as "Plaintiffs."

In addition to John Hancock, Plaintiffs have sued Halpert, the Trust and its trustee, Alexander Ashkenazi ("Ashkenazi"), and those involved in brokering the policy purchase.  The claims against those other defendants are not before the Court, but may be impacted by disposition of the claim against John Hancock.

[2]As discussed in the following paragraph, the policy referenced was not issued until June 13, 2005.  Thus, Schedule A, which identifies the policy by number, must have been appended to the declaration of trust more than two months after the Trust's creation.

2

Although the declaration of trust contemplated a transfer of a life insurance policy owned by Halpert, Ashkenazi purchased a "universal life" policy from John Hancock on the Trust's behalf.[3]  The policy was brokered by Halpert's granddaughter, Gittel.  As with the declaration of trust, however, Halpert denied knowledge of the policy. She further denied authorizing Ashkenazi or anyone else to purchase life insurance on her behalf.  Nevertheless, her signature appears, with Ashkenazi's, on the insurance application.  Halpert testified at her deposition that she signed the signature page without reading the document at the instruction of Joseph Reigler, an insurance agent who lived in her building.  The policy was issued on June 13, 2005, with Halpert as the insured and the Trust as the owner and beneficiary.

As required by New York law, the policy contains the following "incontestability clause":

> This policy, except any provision for reinstatement or policy change requiring evidence of insurability, shall be incontestable after it has been in force during the lifetime of the insured for two years from its Date of Issue, except for nonpayment of premiums.

Merkl Decl., Ex. 13, at JH00000024.  The clause took effect on June 13, 2007.

**B. Premium Payments**

The policy carried an annual premium of $285,000, but there was no fixed schedule for payment.  Instead, the Trust had some discretion to make payments, as long as the policy had sufficient cash value to cover the anticipated cost of the guaranteed death benefit and other administrative costs.

---

[3]Broadly speaking, a universal life (or "UL") policy combines aspects of both term and whole life policies.  A portion of the premium is paid in exchange for a guaranteed benefit ($5,000,0000 in this case) payable to the beneficiary on the insured's death.  The remainder is credited to the cash value of the policy, which bears interest and may be borrowed against or, in some circumstances, withdrawn.

3

John Hancock would "test" the policy's cash value once per quarter. If, on the testing date, the value was insufficient, it would send the Trust a notice of the payment required to prevent the policy from lapsing. The notice stated that the premium was "due upon receipt," but that the policy would not lapse until the expiration of a 60-day grace period called for by the policy. Under the policy, the notice would be sent to the owner and "any assignee of record . . . at least 15 and not more than 45 days before the end of this grace period." Merkl Decl., Ex. 13, at JH00000019.

In 2007, the policy lapsed twice for nonpayment of premiums. On both occasions, John Hancock sent a notice of the lapse to the Trust, inviting it to apply to "reinstate" the policy. Randall Decl., Ex. 9. John Hancock "reversed" or "undid" both lapses when Ashkenazi sent a payment shortly after (ten days on one occasion, one month on the second) the expiration of the grace period.

**C.  Sale of the Policy**

In early 2008, Ashkenazi and Plaintiffs negotiated the sale of the policy. The negotiations culminated in a purchase agreement, dated April 4, 2008, in which Plaintiffs agreed to buy the policy for $900,000.

In the meantime, John Hancock had performed its quarterly test. Having found the policy's value insufficient, it sent the Trust a notice requiring payment of $98,286.12 "to prevent your policy from lapsing on 05/12/2008." Randall Decl., Ex. 6.[4] Plaintiffs learned that the policy had "gone into grace" and directed Ashzenazi to make the payment. Ashkenazi tendered a check for $90,287 on April 3, 2008, and a second check for $8,000, on April 9, 2008.

As part of their due diligence, Plaintiffs requested verification of the policy's status. John Hancock responded in writing on April 21, 2008, stating that the policy was "Inforce [sic]" and paid "current." Merkl Decl., Ex. 20. Its verification form explicitly stated that the information provided was "as of April 21, 2008," and that it "reserve[d] all rights [under] the terms and conditions of the policy(s), and state or federal law." *Id.*

On April 23, 2008, Plaintiffs sent John Hancock forms changing the policy's owner and beneficiary from the Trust to Church Street. The cover letter accompanying the forms instructed John Hancock not to process the forms "if any of the following have occurred since the date of April 11, 2008":

Lapsation

---

[4]The parties dispute the date the notice was sent. The computerized copy of the notice in the record references a "BILLDATE" of February 14, 2008, and a "PAYMENT DATE" of March 23, 2008. Randall Decl., Ex. 6. John Hancock attests, however, that neither date refers to the date the notice was sent. *That* date, it argues, should be inferred to be 60 days prior to the stated lapse date of May 12th—that is, March 13, 2008. The precise date is irrelevant to the Court's decision.

>Policy change resulting in reinstatment of contestability and/or suicide provisions
>Policy loan or withdrawal
>Policy entering Grace Period
>There are any liens against or assignments of the policy

Merkl Decl., Ex. 36.

Ashkenazi's checks were returned for insufficient funds on April 23, 2008, and April 30, 2008, respectively. In response, John Hancock sent the Trust two letters. The first, dated April 23rd, informed the Trust that its April 3rd premium payment had been "reversed." Randall Decl., Ex. 8. It asked that a replacement check be sent within ten days, and warned that failure to do so "could result in the policy lapsing for non payment and termination of contract." *Id*. The second letter, dated April 30th, addressed the April 9th payment, but was otherwise identical. Ashkenazi sent two replacement checks totaling $127,000 on May 9, 2008.[5]

John Hancock processed the change of owner and beneficiary forms on May 19, 2008. That same day, Plaintiffs' representative called John Hancock's 800 number to reconfirm the policy's status. A customer service representative acknowledged that the grace period had been triggered in "March 2008," but stated that the policy was "in good status" and "not at all" in grace as of the date of the call. Merkl Decl., Ex. 37, at JH000000970-71. Those representations were based on the "$127,000 which was applied on the 9th of May, 2008." *Id.* at JH000000969.

The sale of the policy closed immediately after the May 19th telephone call. Shortly thereafter, Plaintiffs paid $285,000 on the policy. The payment was not intended to cover the minimum premium due (which, as noted, Plaintiffs directed the Trust to pay), but was an advance payment of the following year's premium. The payment, backed by sufficient funds, was applied

---

[5]Neither Plaintiffs nor John Hancock offers any reason why the amount changed. It was, of course, Ashkenazi's prerogative to pay more than the minimum required premium.

to the policy's value on May 27, 2008.

**D. Post-Sale Events**

In contrast to Plaintiffs' check, both of Ashkenazi's May 9th checks bounced on June 3rd. John Hancock immediately sent a third letter advising that the replacement payments had been reversed and seeking a further replacement "within 10 days," Randall Decl., Ex. 8; the letter was inexplicably addressed to Halpert, but sent to Church Street's address.  On the same date, John Hancock sent a letter to Church Street (at its correct address) declaring the policy lasped "due to non-payment of premium due on March 22, 2008," but inviting an application for reinstatement. Randall Decl., Ex. 9.

Plaintiffs declined the invitation and, instead, asked John Hancock to reverse the lapse, as it had done in 2007.  After a three-month investigation, John Hancock adhered to its position, returning Plaintiffs' $285,000 payment on September 5, 2008.  This lawsuit followed.

## II

**A. Incontestability**

The sale of life insurance policies to third parties comes in two varieties. In the first, an insured purchases a policy on his or her own life and then assigns it to the third party. New York law approves such transactions, *see* N.Y. Ins. Law § 3205(b)(1), even when the assignee is a complete stranger, *see Saint John v. American Mut. Life Ins. Co.*, 13 N.Y. 31 (1855), and even when the insured purchases the policy with the sole purpose of immediately assigning it. *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 545 (2010).

In the second variety, the third party directly purchases a policy on the life of the insured. The law's approval of this variety is more cautious: the beneficiary named at the time of purchase must be someone with an "insurable interest" in the insured's life, *see* N.Y. Ins. Law § 3205(b)(2),[6] and the insured must consent, in writing, to the purchase, *see id.* § 3205(c). It is the second variety that is at issue in this case.

As John Hancock points out, there is a serious problem with the procurement of the policy on Halpert's life because it appears that she did not validity consent to have her life insured by another. In addition, John Hancock argues—based on apparently uncontradicted evidence—that the Trust was a sham and, accordingly, had no power to purchase the policy or assign it to Plaintiffs. Plaintiffs respond that the incontestability clause bars John Hancock from raising these challenges.

There is merit on both sides. John Hancock is correct that § 3205 could be construed as rendering policies obtained without consent void as against public policy. How could the

---

[6]An "insurable interest" is defined as either (1) "a substantial interest engendered by love and affection" growing out of a familial relationship, or (2) "a lawful and substantial economic interest in the continued life, health or bodily safety of the person insured." N.Y. Ins. Law § 3205(a)(1).

incontestability clause bind John Hancock if the policy containing it were void?

On the other hand, one could also view forgery (if that is what it was) of Halpert's signature on both the declaration of trust and the policy application as frauds perpetrated by Ashkenazi on John Hancock. New York law is clear that an incontestability clause bars fraud claims. *See Johnson v. Metropolitan Life Ins. Co.*, 913 N.Y.S.2d 44, 46 (1st Dep't 2010) ("New York's approach [on incontestability] represents a policy choice to place the onus on the insurance company to investigate, within the two-year period, the veracity of the claims that a potential insured might make in an application for life insurance.").[7]

Because this is a diversity case, the Court's role is not to decide for itself the merits of the argument, but to determine how New York courts would resolve it. *See, e.g., Santalucia v. Seaboard Transp., Inc.*, 232 F.3d 293, 297 (2d Cir. 2000). Since no New York court has addressed whether an incontestability clause covers arguments like those raised by John Hancock, the Court must predict how the New York Court of Appeals would rule, giving the "fullest weight" to its prior pronouncements and "proper regard" to the lower courts of the state. *Id.*

Citing *American Mayflower Life Insurance Co. v. Moskowitz*, 794 N.Y.S.2d 32 (1st Dep't 2005), John Hancock argues that the Trust—and, by extension, Plaintiffs—are strangers to the policy and, therefore, not entitled to invoke the incontestability clause. In *Moskowitz*, the defendant allegedly forged the signature of the insured on an application for life insurance with the plaintiffs. Shortly thereafter, he allegedly forged the same signature on a form designating his company as the new owner and beneficiary of the policy. The plaintiff sued to recover benefits paid to the defendant, arguing, *inter alia*, that the policy was issued based on mistake or fraud. The trial

---

[7]New Jersey, by contrast, allows insurers to assert fraud defenses beyond the incontestability period. *See Johnson*, 913 N.Y.S.2d at 46 (applying New Jersey law).

9

court dismissed those claims as barred by an inconstestability clause.

The First Department reversed. It held that "the provisions for incontestability inure to the benefit of the insured and his beneficiary, or to the benefit of a bona fide assignee, but not a stranger." *Id.* at 35. The allegations that the defendant had forged the transfer of ownership and beneficiary forms, if true, made his company a stranger to the policy. Therefore, there were "genuine questions as to whether plaintiff [was] barred from recovering against [the defendant] for his fraud." *Id.* at 36.

Were Plaintiffs claiming an interest in a policy purchased by *Halpert*, then the lack of a valid transfer to the Trust, and thence to Church Street, would, if true, make Plaintiffs strangers to the policy under *Moskowitz*. But the Plaintiffs derive their interest from *the Trust*, which was the undisputed purchaser, owner and beneficiary of the policy. As such, it is not a complete stranger to the policy, even if Halpert did not consent to its purchase. *Moskowitz*, therefore, is not apposite.

Instead, the Court concludes that the governing law is set forth, by analogy, in *New England Mutual Life Insurance Co. v. Caruso*, 73 N.Y.2d 74 (1989). In that case, the New York Court of Appeals confronted the argument that an incontestability clause barred a claim that a policy was void for lack of an insurable interest. Examining the Insurance Law and its legislative history, the court concluded that "nothing in the statutory scheme makes void *ab initio* policies acquired by one lacking an insurable interest." *Id.* at 81. Therefore, it adhered to its longstanding rule that "passage of the incontestability period bars the insurer from thereafter asserting the policyholder's lack of an insurable interest." *Id.* at 77 (citing *Columbian Nat'l Life Ins. Co. v. Hirsch*, 267 N.Y. 605 (1935), and *Wright v. Mutual Benefit Life Ass'n*, 118 N.Y. 237 (1890)).

The insurable interest requirement and the insured consent requirement are part of the same legislative scheme set forth in § 3205. They are both addressed to preventing life insurance

10

policies from becoming mere "wagering contracts" on the life of another. The incontestability requirement, however, serves a different public policy: to avoid forfeitures by encouraging insurers to promptly investigate potential challenges to validity. In the context of the insurable interest requirement, New York's highest court has held that the policy behind incontestability wins out in case of conflict:

> A failure to enforce the incontestability rule now would result in a forfeiture to defendant and an unnecessary advantage to plaintiff by enabling it to avoid a claim it previously accepted. This inequity may be avoided, and the public purpose underlying the insurable interest requirement implemented, by a rule which encourages the insurer to investigate the insurable interest of its policyholders promptly within the two-year period.

*Caruso*, 73 N.Y.2d at 83. The Court can think of no reason why the insured consent provision would receive a different treatment. Accordingly, the Court holds that John Hancock is bound by the policy's incontestability clause.

**B. Lapse**

By its terms, the incontestability clause does not apply to challenges based on "nonpayment of premiums." Thus, the Court must determine whether the policy lapsed for that reason. Since the question is whether the policy lapsed by its own terms, it presents a matter of contract interpretation and, absent any ambiguities, an issue of law appropriate for resolution on summary judgment. *See Vigilant Ins. Co. v. Bear Stearns Cos.*, 10 N.Y.3d 170, 177 (2008).

At the outset, it is helpful to lay out the parties' somewhat convoluted positions. In John Hancock's view, the Trust's May 9, 2008 checks initially prevented the policy from lapsing at the end of the grace period three days later. When, however, those checks bounced on June 3rd, the credits to the account were "reversed," as if they had never existed. Thus, although the facts giving rise to the lapse did not arise until June 3, 2008, the lapse was retroactively effective to May

11

12, 2008. Plaintiffs' payment of $285,000 on May 27th was of no consequence because, by then, the policy had already lapsed. John Hancock asserts that it retained the money for a reasonable time to conduct an investigation and see if Plaintiffs accept its offer to apply for reinstatement.[8]

---

[8] It is not immediately apparent how reinstatement would have been different from getting John Hancock to reverse the lapse. Recall, however, that the incontestability period restarts in cases of "reinstatement or policy change requiring evidence of insurability." Merkl Decl., Ex. 13, at JH00000024. In other words, reinstatement might have allowed John Hancock to question whether the policy satisfied the requirements of § 3205. As discussed *supra*, Part II.B., it is far from clear that those requirements were met.

Plaintiffs offer several responses. First, they argue that John Hancock modified the payment terms thought a course of conduct— routinely offering an additional ten days to replace bounced checks and accepting such replacement when tendered within that period. Under that theory, the grace period was effectively extended until June 13, 2008; the $285,000 received from Plaintiffs on May 27th prevented the lapse.

Second, Plaintiffs argue that John Hancock's retention of the $285,000 waived the May 12th lapse date. Third, they argue the John Hancock is equitably estoppel from claiming that the policy lapsed in light of its representations on April 23rd and May 19th that the policy was in good standing. Fourth, they argue that the lapse pending notice was legally insufficient to trigger a lapse because it did not comply with New York Insurance Law § 3211. These three arguments are offered as alternatives to Plaintiffs' principal argument that no lapse occurred.

With respect to Plaintiffs' principal argument, the focus is on John Hancock's response to the Trust's bounced checks. Plaintiffs contend that John Hancock's history of granting the Trust ten days to submit replacement checks bound it to follow the same course of conduct when the May 9th checks bounced. John Hancock responds that its prior acceptance of replacement checks never extended the grace period because the Trust was always able to provide good replacement checks before the original grace period expired. Therefore, it argues, it was not obliged to accept replacement checks after the Trust's May 9th checks bounced on June 3rd, because the grace period had expired some 22 days earlier.[9]

John Hancock's prior conduct is irrelevant in light of its undisputed conduct on June

---

[9]John Hancock further notes that the policy contained a provision restricting waivers and policy modifications. The law is clear, however, that such provisions may be waived by conduct inconsistent with their terms. *See, e.g., P&D Cards & Gifts v. Matejka*, 541 N.Y.S.2d 533, 535 (2d Dep't 1989).

13

3rd. Although it declared the policy lapsed on that date, it simultaneously sought a replacement check. The only reasonable interpretation of that offer was that the policy would not lapse (or that the lapse would be reversed) if the check was received within the ten days called for in the offer. Since John Hancock sent the offer to Halpert at Church Street's address, it cannot seriously contend that the offer was made only to Halpert (who had not written the checks and was never the policy's owner). In any event, John Hancock approved the assignment of ownership from the Trust to Church Street, thereby placing the latter in the former's shoes. *See, e.g., Long Island Radiology v. Allstate Ins. Co.*, 830 N.Y.S.2d 192, 194 (2d Dep't 2007).

That John Hancock offered to accept a replacement check did not, *ipso facto*, prevent the policy from lapsing; payment still had to be made within the ten-day period (i.e., by June 13, 2008). It is undisputed, however, that Plaintiffs made a $285,000 payment—more than enough to cover the minimum required premium of $98,286.12—before that date. The payment, which was received before anyone even knew the Trust's May 9th checks would bounce, was obviously completely fortuitous. Nevertheless, the fact remains that the policy had adequate value to prevent a lapse on June 13th.

In sum, John Hancock's offer to accept a replacement check until June 13, 2008, coupled with Plaintiffs' payment on May 27, 2008, prevented the policy from lapsing.

### III

The Court's conclusion that the policy did not lapse on May 12, 2008, does not completely resolve the matter. Because John Hancock took the position that the policy had lapsed, it has not sent any further notices of required premiums and, indeed, returned the $285,000 paid on May 27th. Plaintiffs, for their part, have not made any further payments. It seems obvious, however, that additional premiums would have been required and paid but for this litigation.

14

In other words, Plaintiffs must show that they are ready and able to bring the policy's premiums up to date before the Court can declare that it remains in effect.  *Cf. Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.*, 60 N.Y.2d 997, 998 (1983) (plaintiff has an "obligation to show that it was ready and able to perform its own contractual undertakings . . . in order to secure specific performance").  The parties shall make a good-faith effort to negotiate the payment required and shall report the result of their negotiations  to the Court within thirty days of the date of this Memorandum and Order.  As part of the report, Plaintiffs shall advise whether they intend to pursue their claims against the remaining defendants if the Court declares that the policy remains in effect.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
November 29, 2011